UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 10-50045 |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND |
| vs. | ) | RECOMMENDATION |
| | ) | AS TO DEFENDANTS' |
| ALAN SEPULVEDA-SANDOVAL and | ) | MOTIONS TO DISMISS |
| IVAN BERRELLAZA-VERDUZCO, | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

Defendants Alan Sepulveda-Sandoval and Ivan Berrella-Verduzco are
before the court on charges of possession with intent to distribute a controlled
substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); possession of
a firearm during a drug trafficking crime, in violation of 18 U.S.C.
§ 924(c)(1)(A); being non-immigrant aliens in possession of a firearm, in
violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2); and forfeiture of firearm and
ammunition pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2361(c). Each
defendant has filed a motion to suppress evidence and statements obtained by
law enforcement. See Docket Nos. 44 and 46. The government resists these
motions. See Docket No. 48. The district court, the Honorable Jeffrey L.
Viken, referred these motions to this magistrate judge for a report and
recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**FACTS**

An evidentiary hearing on these motions was held June 21, 2010.
Mr. Sandoval was present and represented by his attorney, Ellery Grey.
Mr. Verduzco was present and represented by his attorney, Steven
Christensen. The government was represented by its Assistant United States
Attorney Mark Vargo. Trooper Matt Oxner of the South Dakota Highway Patrol
and Special Agent Nick Saroff of the United States Immigration and Customs
Enforcement Agency "(ICE"), testified at the hearing. Several exhibits were
received into evidence at the hearing. From this evidence the court makes the
following findings of fact.

At approximately 7:55 a.m. on April 3, 2010, Trooper Matt Oxner was on
duty and received a tip via cell phone from his fellow South Dakota law
enforcement officer Trooper Brian Swets. Trooper Swets told Trooper Oxner
that a Wyoming law enforcement officer had called and informed Swets that a
grey Chrysler Pacifica with Washington state license plates had been stopped
in Wyoming and the officer had issued a warning citation. The Wyoming officer
had been suspicious and had asked the occupants of the Pacifica for
permission to search the vehicle. The occupants had refused to consent to a
search and the Wyoming officer allowed them to leave.

Just before 13:00 p.m. on the same day, Trooper Oxner was on duty in
his marked patrol vehicle operating his radar machine near exit 67 on
Interstate 90 just east of Rapid City, South Dakota. His drug detection dog,

Keya, was in his patrol vehicle with him.  He observed a grey Pacifica with Washington license plates pass him traveling at 69 miles per hour in a 65-mile-per-hour zone.  Trooper Oxner immediately pulled out and followed the Pacifica for approximately three miles.  Trooper Oxner first pulled up in the northernmost lane of the two-lane, divided highway so that his front bumper was approximately even with the rear bumper of the Pacifica, which was in the southernmost lane.  From this vantage point, Trooper Oxner was able to read the license number of the Pacifica and call it into dispatch.

Trooper Oxner then pulled up even with the Pacifica and observed the occupants of that vehicle.  He saw the man he would later learn was Mr. Sandoval driving the vehicle and the man he would later learn was Mr. Verduzco in the front passenger seat apparently sleeping.  Trooper Oxner observed that Mr. Sandoval did not look over at Trooper Oxner as their vehicles traveled next to each other down the highway.  Trooper Oxner then dropped back and turned on his emergency lights in order to stop the defendants' vehicle.  An automatic recording machine was activated simultaneous with the activation of the emergency lights.  A recording made by this device was received into evidence at the hearing as Exhibit 1.  The recording begins at 12:58 p.m.

After Trooper Oxner activated his lights, the Pacifica pulled over to the shoulder of the highway and stopped.  Trooper Oxner exited his patrol vehicle

and approached defendants' vehicle on the passenger side. Trooper Oxner looked inside the vehicle and observed fast food wrappers from Subway. He asked for the driver's license, the vehicle registration, and proof of insurance. Mr. Sandoval was able to produce a driver's license, but not the vehicle registration or proof of insurance. Mr. Verduzco was not able to produce an identification card or driver's license. Trooper Oxner testified that Mr. Verduzco had a frightened expression on his face. When the defendants opened the glove box to look for the requested documents, Trooper Oxner observed a bottle of over-the-counter energy pills.

Also during this interval, Trooper Oxner purportedly observed both defendants' pulse visibly pounding in their carotid arteries. He also purportedly observed Mr. Verduzco's pulse in his belly. From these two observations Trooper Oxner testified that he concluded the defendants were unusually nervous. Trooper Oxner denied that a potential source of nervousness in the defendants was the fact that he had just followed their vehicle in a marked patrol car for three miles, first just off their rear bumper, and then parallel to them.

The court specifically rejects this particular testimony as not credible. First, as to Mr. Verduzco's pulse in his belly, the court observed that both defendants were very slim and wiry. Neither had a protruding belly that would press against their clothing. In addition, Mr. Verduzco was wearing a white

hooded sweatshirt, which would be thicker than an ordinary shirt. A review of the recording of the traffic stop in this case, Exhibit 1, reveals that Mr. Verduzco's hooded sweatshirt fit very loosely on him. These facts make it highly improbable that Trooper Oxner observed Mr. Verduzco's pulse in his belly through his shirt.

Two minutes after making initial contact with the defendants, at 13:01 p.m., Trooper Oxner asked Mr. Sandoval to come back to his patrol vehicle and take a seat in front. Trooper Oxner told Mr. Sandoval that he would issue him a warning ticket. Trooper Oxner appears to have experienced some difficulty in communicating the concept of a warning ticket to Mr. Sandoval.

Trooper Oxner testified that Mr. Sandoval's native language appeared to be Spanish, not English. Trooper Oxner testified that he had taken some Spanish classes in high school and college, but was by no means fluent in Spanish. The language barrier between Trooper Oxner and Mr. Sandoval appears to have been substantial. Again, from a review of the recording of the traffic stop in this case, there are many times where Trooper Oxner and Mr. Sandoval were unable to communicate. At one point Mr. Sandoval spoke to Trooper Oxner, trying to tell him something about "five more," the only English words Sandoval spoke in this particular exchange. Trooper Oxner had him repeat what he was saying several times and finally gave up, unable to

interpret what Mr. Sandoval was trying to tell him. Agent Saroff, who is fluent in Spanish, testified that it would be pointless to try to talk to Mr. Verduzco in English as he did not understand English at all.

In the patrol car, Trooper Oxner sat in the driver's seat and Mr. Sandoval sat in the front passenger seat. Trooper Oxner first began by telling Mr. Sandoval that he was going to issue him a warning citation for speeding and showed Mr. Sandoval the reading on his radar. In response, Mr. Sandoval explained that he had been having some trouble with the cruise control or the transmission in the Pacifica.

Trooper Oxner then began asking Mr. Sandoval a series of questions about his trip. In response to these questions, Mr. Sandoval explained that he and his passenger were traveling from Everette, Washington, near Seattle, and that they were going to Kansas City to look for work as painters. Mr. Sandoval told Trooper Oxner that they planned to stay with Mr. Sandoval's mother in Kansas City. Mr. Sandoval told Trooper Oxner that the vehicle he was driving was owned by his friend, Fernando Cortez Gaxiola. When the Trooper inquired how the Pacifica would be returned to Mr. Gaxiola, Mr. Sandoval explained that Mr. Gaxiola would be traveling to Kansas City to retrieve it at some point in the future. When asked how long Mr. Sandoval had been acquainted with Mr. Verduzco, he responded, "I don't know, maybe 23?" From which Trooper

Oxner interpreted that Mr. Sandoval was saying that he had known

Mr. Verduzco for 23 years.

   Inside the patrol vehicle, Trooper Oxner stated that he made the further observation that Mr. Sandoval clenched his jaw from time to time.  Trooper Oxner testified that he concluded this was evidence that Mr. Sanoval was abnormally nervous.  Trooper Oxner also noted that Mr. Sandoval was dressed in new sneakers, new blue jeans, and a nicer pull-over.  He testified that he found this inconsistent with Mr. Sandoval's story about his trip because Mr. Sandoval's clothing was not the type of clothing usually worn by painters. Trooper Oxner also testified that he observed Mr. Sandoval's hands to be free of callouses and that he found this, too, to be inconsistent with Mr. Sandoval's representation that he was looking for work as a painter.

   At 13:09 p.m., Trooper Oxner left Mr. Sandoval in the patrol vehicle and went back to the passenger's side of the Pacifica where he then interrogated Mr. Verduzco about the same subjects he had just asked Mr. Sandoval about. Mr. Verduzco gave the same answers as Mr. Sandoval: the two were traveling from Everette, Washington, to Kansas City to look for work as painters and planned to stay with Sandoval's mother while they were looking for work. Mr. Verduzco confirmed that the Pacifica belonged to Mr. Gaxiola.  Only two differences between Mr. Sandoval's discussion with Trooper Oxner and Mr. Verduzco's discussion emerged.  One was that Mr. Verduzco explained that

he would probably drive the Pacifica back to Mr. Gaxiola rather than

Mr. Gaxiola traveling to Kansas City to retrieve his vehicle–or at least this is

what Trooper Oxner interpreted Mr. Verduzco to be saying.  The recording of

the traffic stop is far from clear on this point.  The other difference was that

Mr. Verduzco said he and Mr. Sandoval had known each other for 10 years,

rather than the 23 years stated by Mr. Sandovall.  Again, this requires a degree

of interpretation to arrive at the conclusion that Mr. Verduzco was indeed

making this assertion.

Trooper Oxner then asked Mr. Verduzco whether there were any drugs in

the vehicle, and Mr. Verduzco responded that there were not.  As with

Sandoval, Trooper Oxner testified that Mr. Verduzco's clothing–a white hooded

sweatshirt, blue jeans, and sneakers–were not the type of clothing that a

painter would wear.

Trooper Oxner then returned to his patrol vehicle where he told

Mr. Sandoval that he would have to check law enforcement records on

Sandoval's driver's license and the vehicle registration.  Trooper Oxner then

asked Mr. Sandoval whether there were any drugs in the Pacifica.

Mr. Sandoval denied the presence of any drugs.

Only at 13:15 p.m., sixteen minutes after initiating this traffic stop, did

Trooper Oxner call in the information to dispatch regarding Sandoval's driver's

license and the vehicle registration.  Trooper Oxner testified that the delay was

occasioned by the act of actually writing out the warning ticket and reviewing the driver's license and Wyoming ticket that Mr. Sandoval had given him. Again, the court specifically finds this testimony not credible. Exhibit 1, the recording of this traffic stop, as well as Trooper Oxner's own testimony, show that he engaged in substantial discussion with first Mr. Sandoval and then Mr. Verduzco. While the court cannot see on the recording what Trooper Oxner was doing while in his patrol vehicle, the court can observe what Trooper Oxner was doing when he was out of his vehicle in front. From a review of this recording, it is clear that Trooper Oxner was not writing a citation or reviewing documentation while talking to Mr. Verduzco.

When asked why it was necessary to review the Wyoming ticket for purposes of issuing the South Dakota warning ticket, Trooper Oxner said that his review of the Wyoming ticket was related to drug interdiction. He wanted to see who was driving, what the charge was, and the time of the citation in order to see if any facts jumped out at him as indicative of drug trafficking. The court makes a specific finding that Trooper Oxner's primary purpose in this traffic stop was the discovery of evidence of drug trafficking rather than addressing the ostensible reason for the traffic stop–i.e. the speeding violation.

Trooper Oxner testified that dispatch usually responds with information about a driver's license within one minute. A response from dispatch relaying a subject's criminal history takes longer, sometimes up to ten minutes.

After calling the information in to dispatch, Trooper Oxner ran his drug

dog, Keya, around the Pacifica while waiting for the response from dispatch.

Keya alerted to the rear of the vehicle near the location where the license plate

is displayed.  She indicated by scratching at the vehicle in this location.

Photographs were introduced into evidence showing scratches in the dirt on

the Pacifica as a result of Keya's indication.  However, the photos do not clearly

indicate whether the vehicle's paint was scratched.  Trooper Oxner testified

that vehicles are not usually damaged as a result of Keya's indications.

After calling the information in to dispatch, Trooper Oxner ran his drug

Keya and Trooper Oxner were first certified in drug detection following a

seven-week training course in 2003 under the auspices of the International

Congress of Police Service Dogs.  Later, they also received certification

pursuant to state law in South Dakota.  They have undergone continuing

training in the form of eight hours additional training every other week since

they were certified.  Keya was retired May 7, 2010, shortly after the traffic stop

in this case.  Trooper Oxner testified that she retired due to old age as she was

nine and one-half years old at the time.

After Keya indicated, Trooper Oxner asked Mr. Verduzco to exit the

Pacifica.  He patted Mr. Verduzco down, handcuffed him, and stationed him in

the ditch adjacent to the highway.  Trooper Oxner then also handcuffed

Mr. Sandoval.  Trooper Oxner told Mr. Sandoval that Keya had alerted and that

the trooper would be searching the Pacifica.  Following handcuffing both

defendants, Trooper Oxner did not ask any substantive questions of either of them.

Suspecting that contraband was secreted in a hidden compartment, Trooper Oxner arranged to have the Pacifica and both defendants taken to the Highway Patrol shop nearby.  There, the Pacifica was dismantled and contraband was found.

Trooper Oxner notified Special Agent Nick Saroff with ICE, who then traveled to the Highway Patrol shop.  Once there, Agent Saroff made contact with both defendants in order to conduct interviews with them.  Agent Saroff is fluent in Spanish, having worked several years for the United States Border Patrol in the southwestern United States.  Agent Saroff conducted the interviews with the defendants in that language.

The interviews took place in a lunch room at the shop that was approximately 14 feet by 20 feet.  The room contained chairs, a table, two microwaves, and other kitchen-type items.

Agent Saroff advised Mr. Verduzco of his <u>Miranda</u>[1] rights in Spanish and reviewed a written form that reproduced those rights in Spanish.  Agent Saroff asked Mr. Verduzco if he could read, to which he responded he could.  Agent Saroff had Mr. Verduzco then read the written advisement of rights out loud.  A copy of that form was received into evidence as Exhibit 4.  Mr. Verduzco told

---

[1]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Agent Saroff that he understood these rights, and that he was willing to talk to Agent Saroff without a lawyer present.  Agent Saroff testified that Mr. Verduzco sobbed and cried throughout the interview.  Mr. Verduzco did not understand English at all.  Mr. Verduzco repeatedly denied any knowledge of the existence of any drugs or guns in the Pacifica or the origin or destination of those items.

Mid-way through the interview, Mr. Verduzco told Agent Saroff that he had changed his mind and did not want to continue with the interview.  Agent Saroff immediately terminated the interview and asked no further questions.

Agent Saroff then spoke to Mr. Sandoval.  Initially, Agent Saroff asked Mr. Sandoval what he characterized as "booking questions."  Agent Saroff asked Mr. Sandoval his name, date of birth, place of birth, and current address.[2]  He then asked Mr. Sandoval if he was in the United States illegally. Mr. Sandoval agreed that he was.  Agent Saroff advised Mr. Sandoval of his Miranda rights in Spanish.  Mr. Sandoval did not agree to waive those rights and Agent Saroff terminated the interview without discussion of any events related to the traffic stop or the contraband found in the Pacifica.

Both defendants now move to suppress certain evidence.  Mr. Verduzco does not question Trooper Oxner's stop of his vehicle, but does contend that the continued detention of the defendants after the issuance of the warning ticket violated their Fourth Amendment rights, thus necessitating the

---

[2]There was no testimony that Agent Saroff had asked similar questions of Mr. Verduzco prior to advising Mr. Verduzco of his Miranda rights.

suppression of the physical evidence taken from defendants' vehicle. Mr. Verduzco also questions the reliability of Keya and whether she indicated to the Pacifica, arguing that without demonstrated reliability and a clear alert to the car, Keya's actions at the traffic stop cannot provide probable cause for Trooper Oxner's search of the vehicle. Finally, Mr. Verduzco argues that his statement to Agent Saroff should be suppressed. His argument as to the statement are twofold: (1) the statement should be suppressed as "fruit of the poisonous tree" of the Fourth Amendment violation; and (2) the statements were taken in violation of <u>Miranda</u>.

Mr. Sandoval joins in the argument that the continued detention of defendants violated their Fourth Amendment rights and also questions the reliability of Keya. In addition, Mr. Sandoval argues that Trooper Oxner knew before he used Keya to examine the Pacifica that she would damage the Pacifica by scratching it. Under such circumstances, Mr. Sandoval argues that the deployment of Keya in and of itself was a search that required probable cause before embarking upon. Finally, Mr. Sandoval urges the suppression of his statements to Agent Saroff on the same grounds urged by Mr. Verduzco. The government resists both motions to suppress in their entirety.

**DISCUSSION**

**A.**  **Whether the Continued Detention of Defendants at the Traffic Stop Violated the Fourth Amendment and Requires Suppression of the Fruits of the Search**

   **1.**  **Whether the Search was Unreasonably Prolonged**

When a law enforcement officer stops a motor vehicle and questions its occupants, the stop constitutes a seizure under the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief."  Brendlin v. California, 551 U.S. 249, 255-56 (2007); Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Wheat, 278 F.3d 722, 726 (8th Cir. 2001).  A stop of the driver of a vehicle results in a seizure under the Fourth Amendment of all occupants of the vehicle.  Brendlin, 551 U.S. at 255-56.

A traffic stop is legal under the Fourth Amendment if it is supported by probable cause to believe that a violation of law has occurred.  Whren v. United States, 517 U.S. 806, 810 (1996).  "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation.  'This is true even if a valid traffic stop is a pretext for other investigation.' " United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (quoting United States v. Coney, 456 F.3d 850, 855-56 (8th Cir. 2006) (quoting United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002)).  A traffic stop "is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (quoting United States

v. Chatman, 119 F.3d 1335, 1339-40 (8th Cir. 1997)).  An officer's subjective

motivations are irrelevant to the probable cause determination.  Id.

A traffic stop under the Fourth Amendment can also be justified by a

lesser showing of a "reasonable suspicion" pursuant to Terry v. Ohio, 392

U.S. 1 (1968).  United States v. Winters, 491 F.3d 918, 921 (8th Cir. 2007).  An

officer making a Terry stop "must be able to articulate something more than an

'incohate and unparticularized suspicion or "hunch." ' "  United States v.

Sokolow, 490 U.S. 1, 7 (1989).  The Fourth Amendment requires "some

minimal level of objective justification" for making the stop.  INS v. Delgado,

466 U.S. 210, 217 (1984).  The Court has held that probable cause means " 'a

fair probability that contraband or evidence of a crime will be found,' and the

level of suspicion required for a Terry stop is obviously less demanding than for

probable cause."  Sokolow, 490 U.S. at 7 (citing Illinois v. Gates, 462 U.S. 213,

238 (1983)).  "Police must have a 'particularized and objective basis' for

suspecting criminal activity at the time the stop is made."  United States v.

Spotts, 275 F.3d 714, 718 (8th Cir.2002).

"Reasonable suspicion, like probable cause, is dependent upon both the

content of information possessed by police and its degree of reliability.  Both

factors–quantity and quality–are considered in the 'totality of the

circumstances–the whole picture,' that must be taken into account when

evaluating whether there is reasonable suspicion."  Alabama v. White, 496 U.S.

325, 330 (1990) (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981)). If the investigatory stop is not supported by reasonable suspicion or if the officers exceed the proper scope of the stop, then any evidence derived from the stop must be excluded from trial. <u>Wong Sun v. United States</u>, 371 U.S. 471, 484 (1963); <u>Wheat</u>, 278 F.3d at 726.

If the officer has an objectively reasonable belief that the suspect has violated traffic law, even if the officer is mistaken, reasonable suspicion for the stop can still exist. <u>United States v. Bueno</u>, 443 F.3d 1017, 1024-25 (8th Cir. 2006) (citing <u>United States v. Smart</u>, 393 F.3d 767, 770 (8th Cir. 2005)); <u>United States v. Martin</u>, 411 F.3d 998, 1000-02 (8th Cir. 2005).

After an initial stop, the resulting detention must be no longer than reasonably necessary and must be reasonably related to the circumstances which initially justified the stop. <u>Illinois v. Caballes</u>, 543 U.S. 405, 407 (2005); <u>United States v. Sharpe</u>, 470 U.S. 675, 685-87 (1985); <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983). There are no rigid time limitations on a <u>Terry</u> stop. <u>Sharpe</u>, 470 U.S. at 685; <u>United States v. Watts</u>, 7 F.3d 122, 125 (8th Cir. 1993). Rather, the court is to consider the purposes for which law enforcement stopped the vehicle as well as the time reasonably needed to effectuate those purposes. <u>Sharpe</u>, 470 U.S. at 685. The court must consider whether "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain

the defendant." Id. at 686. It is the government's burden to prove that a detention pursuant to reasonable suspicion was sufficiently limited in scope and duration. Royer, 460 U.S. at 500.

The Eighth Circuit has held that a "reasonable investigation of a traffic stop may include checking the driver's license and registration, asking the driver to step out of the vehicle, asking the driver to sit in the patrol car, and requesting the driver's destination and purpose. United States v. Gomez Serena, 368 F.3d 1037, 1040 (8th Cir. 2004) (citing United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002); United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994)); United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (citing United States v. Beck, 140 F.3d 1129, 1134 (8th Cir. 1998)). See also Caballes, 543 U.S. at 407 (a seizure justified by the interest in issuing a ticket to the driver "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."); United States v. Gallardo, 495 F.3d 982, 987 (8th Cir. 2007).

If an officer's permitted initial investigatory steps arouse reasonable suspicions, the officer is "entitled to expand the scope of the stop and ask questions not directly related to the initial traffic stop." Gomez Serena, 368 F.3d at 1040; see also Ramos, 42 F.3d at 1163 (traffic stop may not be expanded unless "objective circumstances supply the trooper with additional suspicion."). "An investigative stop can grow out of a traffic stop so long as the

officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop." Gomez Serena, 368 F.3d at 1041 (citing United States v. Long, 320 F.3d 795, 799-800 (8th Cir. 2003)).

If the investigatory stop is not supported by reasonable suspicion or if the officers exceed the proper scope of the stop, then any evidence derived from the stop must be excluded from trial. Wong Sun, 371 U.S. at 484; Wheat, 278 F.3d at 726.

In United States v. Peralez, 526 F.3d 1115 (8th Cir. 2008), a South Dakota Highway Patrol trooper was on duty with his drug dog. Id. at 1117. The trooper initiated a traffic stop of a van pulling a trailer because the trailer did not have a license plate displayed and the license plate on the van was obscured by the trailer attachment. Id. The officer advised the driver of the van that he was issuing him a warning citation and then embarked on a series of drug interdiction questions. Id. at 1117-18. As in this case, the officer left the driver in the officer's patrol vehicle and approached a passenger in the van and asked the passenger a series of drug interdiction questions. Id. at 1118. Only after speaking to the passenger did the officer return to the patrol vehicle and call in the identification information on the driver and passenger to dispatch. Id. This call-in was performed ten minutes after the officer had told the driver that a warning ticket would be issued. Id. While waiting for

dispatch to call back with information about the two men in the van, the trooper walked his drug dog around the outside of the van.  Id.  The dog indicated that he detected the odor of illegal drugs and a search ensued in which incriminating items were discovered.  Id.

The Eighth Circuit held that, although the trooper had probable cause for the initial stop of the defendant's vehicle, the ensuing detention was illegally prolonged, violating the defendant's Fourth Amendment rights.  Id. at 1119-20. The court noted that the traffic stop had lasted for sixteen minutes before the trooper deployed his drug dog, whereas the trooper had informed the driver that a warning ticket would be issued only three minutes into the stop.  Id. at 1119.  In the intervening thirteen minutes, the trooper asked questions unrelated to the license plate issue and those questions prolonged the stop.  Id. at 1120.  The Eighth Circuit held that the continued detention of the defendants was unwarranted where there was nothing unusual or out of place with the van's registration or the driver's license, where the questions related to drug interdiction more than doubled the time involved in finalizing the ticket for the original reason for the stop, and when it took only one minute for dispatch to respond once the trooper actually did call in the identification information for both occupants of the vehicle.  Id. at 1120-21.  The court stated that "[o]nce an officer has decided to permit a routine traffic offender to depart with a ticket, a warning, or an all clear, the Fourth Amendment applies to limit

any subsequent detention or search." Id. at 1120 (quoting United States v. Alexander, 448 F.3d 1014, 1016 (8th Cir. 2006)).

In United States v. Hernandez-Mendoza, 600 F.3d 971 (8th Cir. 2010), a trooper stopped a vehicle for speeding and deployed his drug dog only six minutes after initiating the stop.  Id. at 975. The Eighth Circuit held that this did not impermissibly prolong the detention.  Id.  Notably, the trooper in Hernandez-Mendoza had additional factors that raised his reasonable suspicions, including a prior alert by a drug dog in Wyoming to the same vehicle, as well as the South Dakota trooper's dog's alert.  Id. at 974.

In this case, neither party disputes the fact that Trooper Oxner's reason for the traffic stop–exceeding the speed limit–was legitimate under the circumstances and legal under the constitution.  So the court is concerned only with the question of whether the continued detention of defendants by Trooper Oxner violated their Fourth Amendment rights.

As to the continued detention in this case, the court finds this case to be more like Peralez than Hernandez-Mendoza.  The factors that Trooper Oxner observed were as follows.  There were sandwich wrappers from a fast food franchise on the floor of defendants' vehicle.  The defendants displayed some nervousness–Mr. Sandoval clenched his jaw in the patrol vehicle during Trooper Oxner's interrogation of him and Mr. Verduzco had a frightened expression on his face when Trooper Oxner approached the vehicle.  Neither of

these are remarkable.  All persons on a trip of any duration will accumulate

debris from the trip in the form of beverage containers, food wrappers, and the

like.  And any citizen would be alarmed to have a law enforcement officer follow

them for three miles, first looming off one's rear bumper and then traveling

parallel to oneself.  And this would be especially startling if one were asleep, as

apparently Mr. Verduzco was, only to be greeted by red flashing lights and an

all-black clad law enforcement officer upon awakening.

Other "suspicious" factors that Trooper Oxner observed are

commonplace.  The presence of energy pills–wholly legal and available at any

truck stop over the counter–cannot be deemed indicative of criminal behavior.

In addition, the stories each defendant told in separate interrogations about

the details of their trip mirrored each other remarkably.  The court cannot

attribute any legal significance to the very minor differences in the details

related by the two defendants to Trooper Oxner, especially given the

substantial language barrier that existed.  Finally, like in Peralez, Trooper

Oxner's actions in the first sixteen minutes of this stop were primarily

concerned with drug interdiction rather than with addressing the reason for

the stop–i.e. the speeding.  This is especially true where, as here and in Peralez,

the officer told the driver that only a warning ticket would be issued within the

first two minutes of the stop.  In addition, if Trooper Oxner had promptly

contacted dispatch with the driver's license and vehicle information, by his own

testimony he would have received a response back within 10 minutes at the most.  This would have enabled Trooper Oxner to conclude the traffic stop long before he actually deployed Keya.

The court discounts entirely Trooper Oxner's suspicions based on the defendants' clothing.  Painters cannot be expected to travel across country in their paint-splattered coveralls any more than judges may be expected to do so in their judicial robes.  The defendants were dressed in blue jeans and tennis shoes with a casual pull-over on one man and a hooded sweatshirt on the other.  This clothing cannot be said to be so out of character for men who earn their living painting so as to arose a reasonable suspicion.  Blue jeans are not at all uncommon as leisure wear for all kinds of persons, including those who earn a living with their hands.

Finally, the court addresses Trooper Oxner's suspicions based on Mr. Sandoval's hands.[3]  Mr. Sandoval was admittedly out of work.  That was why he and Mr. Verduzco were traveling to Kansas City–to look for work.  If the men had been out of work for any length of time, their hands would not have been rough or calloused.  Trooper Oxner never asked how long it had been since either man had been employed nor what their last employment had been.

From the outset of this traffic stop, Trooper Oxner's actions were predominantly intended for drug interdiction and, as a result, the routine

---

[3]Trooper Oxner testified that he did not make a note of the state of Mr. Verduzco's hands.

measures that the law required Trooper Oxner to take care of in connection with the speeding violation were unconstitutionally delayed. The law requires that a traffic stop be "no longer than reasonably necessary" and that it be "reasonably related to the circumstances which initially justified the stop." Caballes, 543 U.S. at 407; Sharpe, 470 U.S. at 685-87; Royer, 460 U.S. at 500. For that reason the court concludes that the prolonged detention of defendants in this case violated both defendants' Fourth Amendment rights.

### 2. Whether the Physical Evidence Should Be Suppressed

However, the conclusion that Trooper Oxner violated the Fourth Amendment does not end the inquiry as regards the question of suppression of the fruits of the search. In the Peralez case discussed above, the Eighth Circuit held that the physical evidence seized should not be suppressed even though the continued detention was unlawful. Peralez, 526 F.3d at 1121-22. The court held that suppression would not be required unless the Fourth Amendment violation was "at least a but-for cause of obtaining the evidence." Id. at 1121 (quoting United States v. Olivera-Mendez, 484 F.3d 505, 511 (8th Cir. 2007)).

In the Peralez case, the court declined to suppress the fruits of the trooper's search because it concluded that the prolonged detention was not a but-for cause of the discovery of the evidence. Id. The court pointed out that the drug dog was on the scene from the outset of the traffic stop–the trooper did not delay in order to bring the dog to the scene. Id. Furthermore, the court

23

held that the trooper would have deployed his dog around the defendants' car in that case regardless of the responses the trooper received from his inquiries. Id. Once the trooper's dog did alert, an inevitable occurrence according to the court, the trooper had probable cause for the search. Id. at 1121-22. Thus, the court held that the prolonged detention was not the cause of the discovery of the evidence. Id.

The evidence in this case presents a closer question. In Peralez, as here, the trooper had his drug dog on the scene with him from the outset of the traffic stop. However, in Peralez, the officer indicated that he was going to deploy his drug dog regardless of the answers the defendants gave him to his questions. In this case, Trooper Oxner never made such a statement about his intentions during the recording of the traffic stop and at the evidentiary hearing in this case he did not testify that this was his unannounced intention. Nevertheless, the court concludes that the analysis of Peralez dooms defendants' attempts to suppress the physical evidence in this case.

Since 7:55 am on the day of the stop, Trooper Oxner had been keeping a lookout for the defendants in their Pacifica because of the tip given to him by Trooper Swets. The court concludes that Trooper Oxner would have found some traffic infraction in order to pull over the Pacifica. As the one of the foremost experts on the Fourth Amendment has observed, once a driver is singled out as "suspicious" for some reason, "it is only a matter of time before

some technical or trivial offense produces the necessary excuse for a traffic stop." Wayne R. LaFave, 4 <u>Search & Seizure: A Treatise on the Fourth Amendment</u>, § 9.3 at 359 (4th ed. 2004). Here, the defendants obliged Trooper Oxner by exceeding the speed limit. Once stopped, the court concludes that Trooper Oxner would not have allowed the Pacifica to depart without deploying Keya around the vehicle. A drug dog sniff is not a search within the purview of the Fourth Amendment and, if no additional delay is involved in employing a drug dog, the officer need not demonstrate probable cause or reasonable suspicion before embarking on a drug dog sniff. <u>Caballes</u>, 543 U.S. at 406-09; <u>United States v. Lopez-Mendoza</u>, 601 F.3d 861 (8th Cir. 2010); <u>United States v. Mohammed</u>, 600 F.3d 1000 (8th Cir. 2010).

The court emphasizes that it is *not* concluding that Trooper Swets' tip itself provided reasonable suspicion for the initial traffic stop. Trooper Oxner testified that he did not know the identity of the Wyoming officer who contacted Swets and did not know what the nature of the Wyoming officer's suspicions were. Thus, Trooper Oxner had neither sufficient information about the reliability of the source for the tip nor did he have sufficiently complete and detailed information about the nature of the tip itself in order to have a reasonable suspicion based on the tip alone. <u>See</u> <u>White</u>, 496 U.S. at 328-29; <u>Adams v. Williams</u>, 407 U.S. 143, 144-47 (1972); 4 <u>Search & Seizure</u> § 9.5(h), at 571 (stating that the central issue of cases involving tips in the context of

Terry stops "is whether the informant's information is so reliable and complete that it makes past, present or pending criminal conduct sufficiently likely to justify a stopping of the designated person for investigation."). Rather, the court's conclusion is based on the undisputed fact that defendants were speeding. Once they gave Trooper Oxner that valid reason to stop them, the court concludes that Trooper Oxner would not have allowed defendants to leave without deploying his readily-available drug dog, Keya. That inevitable deployment and the equally inevitable alert by Keya provided Trooper Oxner with the necessary probable cause for the search.

Regrettably, this is a case where the defendants may not avail themselves of the remedy of suppression as a result of Trooper Oxner's Fourth Amendment violation. The court leaves for another day and a higher court Chief Justice Marshall's observation that every right has a remedy or it is no right at all. Marbury v. Madison, 1 Cranch 137, 163-64 (1803).

**B.      Whether Keya's Alert Provided Probable Cause for the Search**

As an alternative argument, defendants question Keya's reliability and therefore also question the probable cause for the search. Eighth Circuit precedent provides that an alert by a drug dog provides probable cause for a search if the drug dog is reliable. See Peralez, 526 F.3d at 1122; United States v. Sundby, 186 F.3d 873, 876 (8th Cir. 1999) (citing, *inter alia*, United States v. Carrazco, 91 F.3d 65, 67 (8th Cir. 1996); United States v. Delaney, 52 F.3d 182, 188 (8th Cir. 1995)).

In the context of providing probable cause for the issuance of a search warrant, the Eighth Circuit has held that an affidavit to establish a drug dog's reliability is sufficient if the affidavit states that the dog has been trained and certified in the detection of drugs.  Sundby, 186 F.3d at 876 (citing United States v. Kennedy, 131 F.3d 1371, 1377 (10th Cir. 1997); United States v. Berry, 90 F.3d 148, 153 (6th Cir. 1996); United States v. Meyer, 536 F.2d 963, 966 (1st Cir. 1976)).  In a search warrant application, probable cause will not be defeated by the failure to attest to the dog's track record or education.  Sundby, 186 F.3d at 876 (citing Delaney, 52 F.3d at 188; Kennedy, 131 F.3d at 1376-77; Berry, 90 F.3d at 153; United States v. Klein, 626 F.2d 22, 27 (7th Cir. 1980)).

In this case, the government introduced evidence that both Keya and Trooper Oxner were duly trained and certified and that they continued to receive continuing training and certification up through the time of the search in this case.  Furthermore, neither the testimony at the evidentiary hearing in this case nor the court's own review of the recording of the traffic stop in this case (Exhibit 1) cast any doubt on whether Keya alerted to the defendants' vehicle.  Accordingly, the court concludes that Keya's alert provided probable cause for Trooper Oxner's search of the Pacifica.

Mr. Sandoval also argues that Trooper Oxner must have demonstrated probable cause for the deployment of Keya under the special circumstances of

this case.  These special circumstances alleged by Mr. Sandoval are that Keya routinely damages the vehicles to which she alerts.  Thus, Mr. Sandoval argues that before Trooper Oxner could unleash a dog on defendants' vehicle that he knew would damage the vehicle, probable cause must first be demonstrated.

The evidence introduced at the evidentiary hearing in this case does not bear out Mr. Sandoval's assertion.  No evidence was introduced that the defendants' vehicle in this case was damaged by Keya.  And Trooper Oxner testified that Keya has not routinely damaged vehicles in the past by alerting. Therefore, regardless of the legal viability of Mr. Sandoval's argument, the court rejects the argument because the factual underpinning for the argument is lacking.

**C.      Whether Either Defendants' Statements Should be Suppressed**

Both defendants move to suppress their statements, however each defendant's statement involve slightly different facts and arguments, so the court addresses each separately.

**1.      Mr. Sandoval's Statements**

Mr. Sandoval moves to suppress both his statements at the scene of the traffic stop and his statements later at the Highway Patrol shop to Agent Saroff. The court addresses each category of statements separately.

**a.      Statements to Trooper Oxner at the Traffic Stop**

Mr. Sandoval argues that he was "in custody" on April 3, 2010, necessitating the advisement of his <u>Miranda</u> rights.  Since Trooper Oxner did

not advise Mr. Sandoval of his <u>Miranda</u> rights on this date, Mr. Sandoval argues that his statements at the traffic stop and the evidence obtained from his vehicle should be suppressed.

The holding of the <u>Miranda</u> case "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)). <u>Miranda</u> warnings protect an individual's Fifth Amendment privilege against self-incrimination by "ensuring that a suspect knows that he may choose not to talk to law enforcement, to talk only with counsel present, or to discontinue talking at any time." <u>Colorado v. Spring</u>, 479 U.S. 564,  574 (1987).  A <u>Miranda</u> warning is required prior to questioning whenever two conditions are present:  (1) the suspect is being interrogated and (2) the suspect is in custody.  <u>United States v. Flores-Sandoval</u>, 474 F.3d 1142, 1146 (8th Cir. 2007); <u>Griffin</u>, 922 F.2d at 1347; <u>United States v. Carter</u>, 884 F.2d 368, 371 (8th Cir. 1989).

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.  <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).  Here, neither party disputes that Mr. Sandoval was being interrogated on April 3, 2010, and neither disputes that he was not advised of his <u>Miranda</u> rights.  Therefore, whether the

statements obtained at the traffic stop should be suppressed hinges on whether Mr. Sandoval was in custody at that time, thereby requiring the administering of <u>Miranda</u> warnings.

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government.  <u>See</u> <u>United States v. Charbonneau</u>, 979 F. Supp. 1177 (S.D. Ohio 1997).  Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden.  <u>See</u> <u>United States v. Moore</u>, 104 F.3d 377, 391 (D.C. Cir. 1997).  The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have.  <u>See e.g.</u> <u>United States v. Morriss</u>, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority).  For purposes of this report and recommendation, the court has placed the burden of proving that Mr. Sandoval was *not* in custody on the government.

A suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in any significant way."  <u>Griffin</u>, 922 F.2d at 1347 (citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 429 (1984)).  Absent formal arrest, a suspect is deemed is be "in custody" where a reasonable person in the

suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest."  Berkemer, 468 U.S. at 442; United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.  The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator.  Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.  In determining whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances.  Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)).

The Supreme Court in Berkemer addressed the issue of whether a motorist who is the subject of a traffic stop is "in custody" for purposes of Miranda.  After the motorist is formally arrested on a traffic violation, no matter how minor, the Court held that Miranda warnings are required.  Berkemer, 468 U.S. at 434-35.

However, during the traffic stop itself and prior to arrest, the Court held that Miranda did not apply.  Id. at 440-41.  The Court acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" in the detained vehicle, noting that drivers who see a policeman's signal neither feel free to ignore that signal nor to drive away, once stopped. Id. at 436.

However, a traffic stop is generally devoid of those elements of coercion that prompted the announcement of the rule in <u>Miranda</u>.  <u>Id.</u> at 436-38.  For example, the detention is presumptively temporary and brief, with the driver being allowed to continue on his way after a check of his license and registration and, perhaps, the issuance of a citation.  <u>Id.</u> at 437.  Also, the interrogation takes place in public, subject to observation by pedestrians and other vehicles, thus reducing the ability of an unscrupulous policeman to "use illegitimate means to elicit self-incriminating statements and diminish[ing] the motorist's fear that, if he does not cooperate, he will be subjected to abuse." <u>Id.</u> at 438.  Thus, the Court concluded that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda." <u>Id.</u> at 440.

The facts of this case are controlled by the holding in <u>Berkemer</u>.  Prior to handcuffs being placed on Mr. Sandoval, this was a routine traffic stop. Although he was not free to leave, neither was Trooper Oxner required to advise him of his <u>Miranda</u> rights.  <u>Berkemer</u>, 468 U.S. at 440-41.  That situation changed as soon as Keya alerted and Trooper Oxner handcuffed Mr. Sandoval. However, no further interrogation took place after this point at the scene of the traffic stop.  Accordingly, the court concludes that Mr. Sandoval's motion to suppress his statements made at the scene of the traffic stop be denied.

### b.      Mr. Sandoval's Statements to Agent Saroff

Mr. Sandoval also argues that his statements made in response to Agent

Saroff's questions after he was placed in handcuffs should be suppressed

because those questions preceded Agent Saroff's advisement of his <u>Miranda</u>

rights.  The government does not dispute that Agent Saroff asked Mr. Sandoval

questions prior to the advisement of <u>Miranda</u> warnings.  Nor does the

government dispute that Mr. Sandoval was in custody at this point.   However,

the government contends that the pre-<u>Miranda</u> questions asked by Agent Saroff

were routine booking questions not covered by the rule in <u>Miranda</u>.

As stated previously, a <u>Miranda</u> warning is required prior to questioning

whenever two conditions are present: (1) the suspect is being interrogated <u>and</u>

(2) the suspect is in custody.  <u>Flores-Sandoval</u>, 474 F.3d at 1146; <u>Griffin</u>, 922

F.2d at 1347; <u>Carter</u>, 884 F.2d at 371.  It is clear that Mr. Sandoval was in

custody for purposes of <u>Miranda</u> when he was handcuffed and placed under

formal arrest.  Therefore, whether his statements should be suppressed

depends on whether the statements were the product of police interrogation.

Interrogation includes direct questioning or any practice reasonably

likely to evoke an incriminating response from a suspect.  <u>See</u> <u>Innis</u>, 446 U.S.

at 301; <u>see also</u> <u>United States v. Head</u>, 407 F.3d 925, 925 (8th Cir. 2005)

("Interrogation includes not only express questioning by law enforcement

officers, but also words or actions that officers should know are reasonably

likely to elicit an incriminating response from a suspect.").  The "words or

actions" of the police must be outside the scope of words and actions that normally accompany the arrest and taking into custody of a defendant.  United States v. Wipf, 397 F.3d 677, 685 (8th Cir. 2005) (citing Innis, 446 U.S. at 301).

At the outset, it is clear that, absent Miranda warnings, Agent Saroff's question as to whether Mr. Sandoval was in this country legally constitutes interrogation as any response could incriminate Mr. Sandoval and possibly lead to additional charges.  See Head, 407 F.3d at 925.  Indeed, one of the charges facing Mr. Sandoval requires proof that he is a non-immigrant alien.  See Indictment, Count III at Docket No. 1, page 2 (alleging violations of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2)).  There is a large body of law discussing what questions can be considered "routine booking questions" and thus permissible without advisement of Miranda rights and what questions are incriminating.

In Pennsylvania v. Muniz, 496 U.S. 582, 600-01 (1990), the defendant, who had been arrested for driving under the influence following a traffic stop and had not been advised of his Miranda rights, was asked a series of questions regarding his name, address, height, weight, eye color, date of birth, and current age during the booking process at the police station.  Id. at 585-86.  The defendant was also asked whether he knew what the date was of his sixth birthday.  Id. at 586.  With regard to the first series of questions, the Court held that, although it disagreed with the government's contention that

the questions do not qualify as custodial interrogation, nevertheless such questions fell within a "routine booking question" exception to <u>Miranda</u>. <u>Id</u>. at 601. Answers provided in response to routine booking questions designed to secure biographical data necessary to complete the booking process fall outside of the scope of protections afforded by <u>Miranda</u>, and, thus, even in the absence of <u>Miranda</u> warnings, do not require suppression. <u>Id.</u> at 601-02. However, with regard to the question about the defendant's sixth birthday, the Court held that the defendant's response to custodial interrogation should have been suppressed because it was testimonial. <u>Id.</u> at 600.

The Court defined testimonial evidence as all responses to questions that "could place the suspect in the 'cruel trilemma'" of self-accusation, perjury, or contempt. <u>Id.</u> at 596-97. The Court reasoned that, in response to the question about his sixth birthday, the defendant was confronted with the options of remaining silent (which the Court found would be difficult to do given the "inherently coercive environment created by the custodial interrogation"), incriminating himself because he did not know the answer, or answering untruthfully by providing an incorrect guess. <u>Id.</u> at 598-99. Hence, "the incriminating inference of impaired mental faculties stemmed, not just from the fact that [the defendant] slurred his response, but also from a testimonial aspect of that response." <u>Id.</u> at 599.

In an Eighth Circuit case decided before <u>Muniz</u>, the court refused to suppress questions posed to a defendant by a pre-trial probation officer in the context of a bond interview pursuant to the Bail Reform Act.  <u>See</u> <u>United States v. McLaughlin</u>, 777 F.2d 388, 392 (8th Cir. 1985).  In this context, the court held that suppression was not required because the probation officer could not have expected the inquiry regarding the defendant's employment and residence to elicit an incriminating response.  <u>Id.</u>

In <u>United States v. Brown</u>, 101 F.3d 1272, 1274 (8th Cir. 1996), officers stopped the defendant's vehicle and arrested him for possession of cocaine after observing him engage in a drug transaction.  In response to the officers' question and without being provided <u>Miranda</u> warnings, the defendant provided a false name, and it was not until the next day that the officers learned of his true identity.  <u>Id.</u>  The defendant sought to suppress his statement giving a false name, arguing that he was subject to "custodial interrogation for investigative purposes," and should have been read his <u>Miranda</u> rights.  <u>Id.</u>  The Eighth Circuit affirmed the district court's refusal to suppress on the grounds that the question posed was not investigative in nature, the defendant's name was not related to the substantive offense charged, and the question  was "wholly incidental" and necessary for the booking process.  <u>Id.</u> at 1274-75.  The court reasoned that if the defendant had

provided his real name, the information would not have been incriminating.  Id. at 1274.  The court provided the following analysis:

> It is well-settled that routine biographical data is exempted from Miranda's coverage.  We have said:
>
>> A request for routine information necessary for basic identification purposes is not interrogation under Miranda, even if the information turns out to be incriminating.  Only if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the question be subject to scrutiny.

Id. (quoting McLaughlin, 777 F.2d at 391-92) (additional citations omitted). The court ultimately concluded that the false-name statement provided by the defendant at the scene of the stop fell within the routine booking question exception.  Id.

The Eighth Circuit in McLaughlin cited a Second Circuit case, United States v. Burns, 684 F.2d 1066 (2d Cir. 1982), with approval.  McLaughlin, 777 F.2d at 392.  In Burns, the defendant had been given Miranda warnings at the time he was interrogated by Drug Enforcement Agency (DEA) agents.  Burns, 684 F.2d at 1075.  After answering a few questions, Burns invoked his right to counsel.  Id.  Thereafter, an Assistant United States Attorney gave Burns new Miranda warnings and then interrogated him again, ostensibly for purposes of a bail hearing.  Id.  The Second Circuit rejected the government's

characterization of the second interview as seeking merely "pedigree information" that fell outside the scope of Miranda. Id. at 1075-76.[4]

In another pre-Muniz case that presaged the investigatory/routine booking dichotomy set forth by the Court in Muniz, the court in United States v. Poole, 794 F.2d 462 (9th Cir. 1986), suppressed a defendant's statement giving a false name. Poole was given Miranda warnings and invoked his right to remain silent, but police continued to interrogate him, eliciting a statement from Poole in which he gave a false name. Id. at 464. Noting that "[a]n incriminating statement is 'any response-whether inculpatory or exculpatory–that the prosecution may seek to introduce at trial,'" the court found that the questions posed by the police to Poole were not part of the routine booking process, but were part of an interview which was conducted for investigatory purposes. Id. at 466 (quoting Innis, 446 U.S. at 301 n.5).

Here, the questions to Mr. Sandoval as to where he was born, his date of birth, and his current address seem to fall into the category of "routine booking questions." The answers to none of these questions, standing alone, would tend to incriminate Mr. Sandoval on any of the charges he is currently facing. However, the question as to whether he was in this country legally is not in the same category. The answer to that question provided incriminating evidence for one of the charges Mr. Sandoval now in fact faces. The court concludes

---

[4]However, because the issue was not preserved below, it did not survive harmless error analysis on appeal. Burns, 684 F.2d at 1076.

that, since Mr. Sandoval was in custody at the time Agent Saroff asked this question, and because the question preceded the advisement of <u>Miranda</u> rights, this question and its answer should be inadmissible at trial. The court so recommends.

### 2.     Mr. Verduzco's Statement to Agent Saroff

Mr. Verduzco does not move to suppress the statements he made at the scene of the traffic stop, only those statements to Agent Saroff. Agent Saroff undeniably advised Mr. Verduzco of his <u>Miranda</u> rights before embarking on his interrogation and Mr. Verduzco waived those rights and agreed, initially, to talk to Agent Saroff. When Mr. Verduzco later changed his mind and told Agent Saroff that he no longer wished to speak to the agent, Agent Saroff immediately terminated the interview. The issue before the court, then, is whether Mr. Verduzco's waiver of his <u>Miranda</u> rights  was valid.

It is the government's burden to prove that a defendant's waiver of his <u>Miranda</u> rights was voluntary, knowing, and intelligent. <u>United States v. Caldwell</u>, 954 F.2d 496, 508 (8th Cir. 1992). "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." <u>Miranda</u>, 384 U.S. at 475. However, the government "need prove waiver only by a preponderance of the evidence." <u>Connelly</u>, 479 U.S. at 168.

A waiver of one's <u>Miranda</u> rights may be either express or implied. <u>Berghuis v. Thompkins</u>, ___ U.S. ___, 2010 WL 2160784, *10 (June 1, 2010) (citing <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-76 (1979)). An implied waiver occurs when the suspect embarks on a course of conduct indicating, given the totality of circumstances, waiver. <u>Id.</u> at * 10-11. The government must show that the suspect was advised of his <u>Miranda</u> rights, understood those rights, and then chose to make an uncoerced statement. <u>Id.</u> Simply proving that a <u>Miranda</u> advisement was given and that a statement was later made is not sufficient. <u>Id.</u> Although the advisement itself is formalistic, the waiver need not be formalistic and the waiver need not comply with the procedures set out in Fed. R. Crim. P. 11 for waiver of an accused's rights to trial in open court during a plea proceeding. <u>Id.</u>

Whether Mr. Verduzco effectively waived his <u>Miranda</u> rights requires two inquiries:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

<u>United States v. Jones</u>, 23 F.3d 1307, 1313 (8th Cir. 1994) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)).

"Only if the 'totality of circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may

a court properly conclude that the Miranda rights have been waived." Jones, 23 F.3d at 1313. Examination of the totality of circumstances includes, but is not limited to, such considerations as the "background, experience, and conduct" of the defendant. Jones, 23 F.3d at 1313 (quoting United States v. Barahona, 990 F.2d 412, 418 (8th Cir. 1993)).

### a. Whether Mr. Verduzco's Miranda Waiver was Voluntary

The same analysis concerning the voluntariness of a defendant's confession under the Fifth Amendment applies to determine whether a defendant's Miranda waiver was voluntary. See Makes Room for Them, 49 F.3d 410, 415 (8th Cir. 1995) (a court must consider the conduct of the police when determining whether defendant's will was overborne with regard to either his confession or his Miranda waiver). Under either analysis, "[a]bsent evidence that [defendant's] will [was] overborne and his capacity for self-determination critically impaired *because of* coercive police conduct," a waiver of Miranda rights will be considered voluntary. Spring, 479 U.S. at 574 (emphasis supplied). Agent Saroff did not coerce or threaten Mr. Verduzco in any way to elicit either his statements or Miranda waiver. Instead, he patiently explained the Miranda rights, took special pains to make sure that Mr. Verduzco understood those rights, including speaking to Verduzco in Spanish, providing an advisement of rights form in Spanish for Verduzco's review, and ensuring that Verduzco was literate and could read and understand the form.

Accordingly, the court finds that Mr. Verduzco voluntarily waived his <u>Miranda</u> rights.

It is clear that Mr. Verduzco was distraught during the interview with Agent Saroff.  However, that appears to have been the result of the situation he found himself in rather than the result of any coercive action on Agent Saroff's part.  Furthermore, there is no evidence that Agent Saroff acted in any way to exploit Mr. Verduzco's emotionality.  The conclusion that Agent Saroff did not break Mr. Verduzco's will and coerce him into participating in the interview is borne out by the fact that Mr. Verduzco felt sufficiently assertive later in the interview to tell Agent Saroff that he had changed his mind and wanted to cease the interview.  And the court notes that the interview promptly ceased.

### b.    Whether Mr. Verduzco's <u>Miranda</u> Waiver was Knowing and Intelligent

With regard to this second inquiry, whether Mr. Verduzco made a knowing and intelligent waiver, "[a] waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right..." <u>Thai v. Mapes</u>, 412 F.3d 970, 977 (8th Cir. 2005).  Although police coercion is a necessary predicate to finding that a waiver was involuntary, it is *not* determinative on the separate issue of whether the waiver was knowing and intelligent.  <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998).

"As a general matter ... an accused who is admonished with the warnings prescribed by this Court in Miranda has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one..."  United States v. Garlewicz, 493 F.3d 933, 936 (8th Cir. 2007). "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." Moran, 475 U.S. at 422-23.

The Court in Miranda explained further:

> At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it– the threshold requirement for an intelligent decision as to its exercise.  More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. . . .
> The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege.

Miranda, 384 U.S. at 467-68, 469.

In Turner, police officers stopped Turner's vehicle after observing erratic driving. Id. at 553. Officers administered field sobriety tests to Turner and concluded that he was under the influence of some drug other than alcohol. Id. at 554. After arresting Turner and advising him of his Miranda rights, officers transported him to jail and conducted a urine test, which came back positive for phencyclidine (PCP). Id.

Officers again advised Turner of his Miranda rights and Turner signed a waiver form, initialing each admonition. Id. During the interview, Turner appeared cooperative; however, he subsequently exhibited bizarre behavior. Id. Upon examination, several psychiatrists diagnosed Turner with a having a PCP-induced psychotic disorder and an intelligence quotient ("IQ"), in the low-average to borderline range. Id. Turner moved to suppress the statements he made to law enforcement, arguing that, because of his low IQ, PCP intoxication, and mental illness, he did not have the mental capacity to intelligently and knowingly waive his constitutional rights. Id.

The court rejected this argument, finding the following facts persuasive: Turner was cooperative during the interview; he reviewed and initialed each admonition of the waiver form; he agreed to answer questions; he gave accurate information; and he appeared intelligent enough to understand his rights. Id. at 555. See also North Carolina v. Butler, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the

right to counsel is usually strong proof of the validity of that waiver...");

Rohrbach, 813 F.2d at 145 (in determining that defendant's waiver was knowing and intelligent, the court found persuasive the fact that his history of arrests, convictions, and reform school made him quite familiar with the criminal justice system).  The Turner court concluded that Turner's waiver of his Miranda rights was knowing and intelligent.  Turner, 157 F.3d at 557.

In United States v. Marquez, 605 F.3d 604 (8th Cir. 2010), the Eighth Circuit held that the district court did not err in concluding that defendant voluntarily and intelligently waived his Miranda rights where defendant's first language was Spanish, but where he conversed with investigators easily in English and his girlfriend testified that the defendant spoke "conversational" English and that she could converse with him on most subjects most of the time in English.  Id. at 609.

The advisement of rights given by Agent Saroff in this case to Mr. Verduzco fully and fairly described Mr. Verduzco's Miranda rights. Furthermore, it did so in the defendant's own native language.  The evidence shows that Mr. Verduzco was able to read and comprehend the form and the rights they described.  The court concludes that Mr. Verduzco's waiver of his Miranda rights was knowing and intelligent.

**3.      Suppression of Either Defendants' Statements to Agent Saroff as Fruit of the Fourth Amendment Violation**

Both defendants assert the argument that their statements to Agent Saroff should be suppressed because they are "fruit of the poisonous tree" of the Fourth Amendment violation occasioned by their illegal prolonged detention by Trooper Oxner. The court must consider three factors to determine whether the statements to Agent Saroff were the fruit of the Fourth Amendment constitutional violation, or whether they were obtained by "means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371 U.S. 487-488. Those three factors are: (1) the temporal proximity of the discovery of the evidence to the Fourth Amendment violation; (2) the existence of intervening causes between the violation and the discovery; and (3) the purpose or flagrancy of the official misconduct. Brown, 422 U.S. at 603-604.

Of these factors, the purpose and flagrancy of police misconduct is "the most important factor because it is directly tied to the purpose of the exclusionary rule–deterring police misconduct." United States v. Simpson, 439 F.3d 490, 496 (8th Cir. 2006) (citing United States v. Reed, 349 F.3d 457, 464-465 (7th Cir. 2003)).

In addition to these three factors, when the object of the suppression argument is a defendant's statement, the court also considers whether the defendant received and waived Miranda warnings before making the statement. Brown, 422 U.S. at 603-604. The giving of Miranda warnings following a constitutional violation and before the taking of a suspect's statement does not,

46

by itself, purge the taint of the original violation. <u>Brown</u>, 422 U.S. at 601-603. Whether the statement was the product of a clear act of free will on the part of the defendant and not the fruit of the constitutional violation depends on whether a sufficient lapse in time has occurred between the constitutional violation and the interrogation, whether there was a change in location as to the interrogation, whether the interrogator is the same person who violated the defendant's constitutional rights, and the flagrancy and purpose of the government's misconduct in the initial illegality. <u>Oregon v. Elstad</u>, 470 U.S. 298, 310 (1985); <u>Taylor v. Alabama</u>, 457 U.S. 687 (1982); <u>Brown</u>, 422 U.S. at 603-604.

In the <u>Wong Sun</u> case, police violated the Fourth Amendment when they entered the residence of James Wah Toy and arrested him without probable cause. <u>Id.</u> at 473-475, 484-486. As a result of this constitutional violation, the Court applied the exclusionary rule to suppress statements Toy made while the officers were in his home illegally, and to suppress heroin obtained from Johnny Yee within one hour of the illegal arrest of Toy that derived from Toy's statements. <u>Id.</u> at 473-476, 485-488. The Court held that the circumstances did not show that the police discovered the heroin from an independent source, nor that the connection between the constitutional violation and the discovery of the heroin had "become so attenuated as to dissipate the taint" of the constitutional violation. <u>Id.</u> at 487. Rather, the Court held that the heroin was

obtained through exploitation of the original Fourth Amendment violation.  Id. at 488.

However, even though Wong Sun's Fourth Amendment rights had been violated by an arrest without probable cause, not all evidence subsequent to that violation was suppressed by the Court.  Wong Sun, 371 U.S. at 491-492. After he was arrested, Wong Sun  was arraigned, then released on his own recognizance, and returned to the police station several days later and gave a statement.  Id.  The Supreme Court held that this latter statement was admissible, despite the Fourth Amendment violation, because "the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.' " Id. at 491 (citing Nardone v. United States, 308 U.S. 338, 341 (1939)).

In United States v. Guevara-Martinez, 262 F.3d 751, 752 (8th Cir. 2001), Guevara-Martinez was subject to an illegal traffic stop and detention, during which methamphetamine was discovered.   He was then arrested and his fingerprints were taken.  Id.  Although indicted on drug charges, those charges were dismissed when the district court granted defendant's motion to suppress. Id.  Guevara-Martinez was then indicted on immigration offenses which came to light as a result of the police having taken his fingerprints.  Id.  The Eighth Circuit held that the fingerprint evidence should be suppressed because, although police did not arrest Guevara-Martinez for the sole purpose of

48

obtaining his fingerprints, nevertheless the fingerprints were obtained "by exploitation" of the primary illegality–the illegal traffic stop, detention, and arrest–and nothing had intervened which would "purge the primary taint" of that constitutional violation.  Id. at 755-756 (citing Wong Sun, 371 U.S. at 488).  The court held that "[e]vidence can be obtained 'by exploitation' of an unlawful detention even when the detention is not for the sole purpose of gathering that evidence."  Id. at 755.

In the Brown case, Richard Brown's Fourth Amendment rights had been violated by an illegal arrest and subsequent detention at approximately 7:45 p.m.  Brown, 422 U.S. at 592-594.  Thereafter, he was transported for approximately 20 minutes in a patrol car to a police station.  Id. at 593-594.  Once there, the same officers who had just arrested him gave him Miranda warnings and then proceeded to interrogate Brown, who waived his Miranda rights and gave a statement.  Id. at 594.  Brown was kept in custody until approximately 2:00 a.m. that following day, when he was interrogated a second time, this time by a prosecuting attorney, who also advised Brown of his Miranda rights prior to interrogating him.  Id. at 594-596.

The Court held that both statements should be suppressed.  Id. at 604-605.  In reaching this conclusion, the court noted that the first statement was given less than two hours following Brown's illegal arrest and that "there was no intervening event of significance whatsoever."  Id. at 604.  Furthermore, the

Court emphasized that the Fourth Amendment violation in this case "had a quality of purposefulness," noting the obvious impropriety of the arrest and the officers' virtual concession of that fact at the suppression hearing.  Id. at 605. The Court also held that "the second statement was clearly the result and the fruit of the first."  Id.

In Carter, 884 F.2d at 372-373, the court held that a statement taken after duly-given Miranda warnings had to be suppressed as "fruit of the poisonous tree" where the interrogators who had violated Carter's constitutional rights were the same interrogators who obtained the post-Miranda statement and there was no passage of time between the constitutional violation, the Miranda warning, and the post-Miranda statements, all of which "occurred as a part and parcel of a continuous process."  See also United States v. Reinholz, 245 F.3d 765, 779-780 (8th Cir. 2001) (affirming suppression of defendant's statement where he had been arrested illegally, detained with officers in patrol car for 25-minute ride, and made several statements to these same officers both before and after receiving Miranda warnings, but all following directly on the heels of the arrest with no change in interrogators, location, or intervening lapse of time); United States v. Chavez, Crim. No. 00-50099-KES, at page 4 (D.S.D. April 23, 2001) [Docket No. 42] (suppressing defendant's statements made during an illegal detention where the statements occurred during the traffic stop, in response to questions

from the same officer that committed the Fourth Amendment violation, and no

Miranda warnings or intervening factors occurred).

In United States v. Vega-Rico, 417 F.3d 976, 980 (8th Cir. 2005), where

the defendant gave a Mirandized statement four days after his Fourth

Amendment violation, the interview was conducted in a different location than

the violation, and the interrogator was a different person from a different law

enforcement agency which had had no involvement in the Fourth Amendment

violation, the court held that the taint of the constitutional violation had been

purged and that the defendant's statement was admissible.

In Black Bear, 422 F.3d at 664-665, the court refused to suppress a

Mirandized statement obtained after an earlier, unwarned statement, where the

second warned interrogation took place 24 hours after the first, an additional

law enforcement officer was present at the second interview, the two interviews

took place in different locations, there was no cross-referencing overlap

between the two interrogations, the interrogator in the second interview did not

treat it as a continuation of the first interview, and the defendant was not

under police control during the intervening 24 hours.

As to the element of purposeful and flagrant police misconduct, the

Eighth Circuit noted that courts have found such conduct where the

impropriety of the conduct was obvious and the official knew at the time that

he was likely violating the suspect's rights or where the misconduct was

"investigatory in design and purpose and executed 'in the hope that something might turn up.' " Herrera-Gonzalez, 474 F.3d at 1113 (quoting Simpson, 439 F.3d at 496 (quoting Brown, 422 U.S. at 605). However, a mistake, even if unreasonable, is not alone sufficient to establish flagrant conduct. Id.

In Herrera-Gonzalez, the Eighth Circuit refused to find a purposeful and flagrant violation of the defendant's Fourth Amendment rights where the officer had difficulty in verifying the defendant's plates and driver's license because these things gave the officer a reason to be suspicious. Id. at 1113-1114. In Vega-Rico, the court found there was no flagrant official misconduct where the police relied upon an unreliable drug dog as the basis for their search. Vega-Rico, 417 F.3d at 980. Where the officer cannot be said to have acted purposefully in violating the defendant's rights, even where the arrest and statement are close in time and there are no intervening factors, the Eighth Circuit has refused to apply the exclusionary rule. See Ramos, 42 F.3d at 1164.

The Eighth Circuit has said of the element of temporal proximity that ten minutes between the constitutional violation and the act of giving consent was neither conclusively too short a period of time nor conclusively long enough of a period to have purged the taint of the original violation. Herrera-Gonzalez, 474 F.3d at 1111-1112. The court held that consent given a short time after an illegal stop can be "sufficient to purge the taint if other circumstances

indicate that the consent was sufficiently an act of free will." Id. at 1112 (citing United States v. Palacios-Suarez, 149 F.3d 770, 772-773 (8th Cir. 1998)). In United States v. Becker, 333 F.3d 858, 862-863 (8th Cir. 2003), a lapse of 49 minutes between the defendant's unlawful detention under the Fourth Amendment and his voluntarily giving consent to a search was held sufficient time to have allowed the taint to be purged.

In an analogous case, a plurality of the Supreme Court held that a second, Mirandized statement must be suppressed when it was preceded by an earlier, unwarned statement, where the facts show a deliberate intent on the part of interrogators to circumvent and undermine Miranda and the circumstances of the giving of the Miranda warning were unlikely to have alerted the suspect that his or her earlier statement was inadmissible, and that he or she had a real choice about whether to give the second statement. See Missouri v. Seibert, 542 U.S. 600, 604-618 (2004) (opinion of Stevens, J.); and id. at 619-622 (opinion of Kennedy, J., concurring in the judgment). As under the Brown analysis, the plurality in Seibert found the officer's intent to violate the suspect's rights to be of paramount importance. Id. at 611-617 (opinion of Stevens, J.) (emphasizing that this case presented facts indicating that the strategy of the officers was to deliberately undermine and circumvent Miranda, while the conduct of the officer in Elstad indicated "a good-faith Miranda mistake"); and id. at 618-622 (Breyer, J., concurring) (emphasizing that the

facts in Seibert showed a deliberate violation of Miranda by police, while the facts of Elstad did not).

Also, like the Brown analysis, the Seibert plurality held that Mirandized statements following a statement taken in violation of Miranda could still be admissible where sufficient intervening facts existed that established the probable effectiveness of the Miranda warnings when given, such as a change in location for the second interrogation, a change in identity of the interrogators, a lapse of time, and an absence of any cross-pollination between the first and second statements so that the suspect would understand that the second statement stood on its own and was not a continuation of the first statement. Id. at 611-617 (opinion of Stevens, J.); and id. at 618-622 (Breyer, J., concurring).

Applying the above case law, the court concludes that neither defendants' statements to Agent Saroff should be suppressed as fruit of the illegal detention. First, Agent Saroff fully advised both defendants of their Miranda rights before taking their statements. There is absolutely no fact in the record that would indicate that Mr. Verduzco's waiver of his Miranda rights was unintelligent or coerced in any way. Thus, this case is unlike that of Flores-Sandoval, 422 F.3d at 713-715, where the Eighth Circuit affirmed the suppression of a defendant's statement taken while he was unlawfully detained

because there was no showing by the government that the defendant had been given <u>Miranda</u> warnings and waived them.

Second, the temporal proximity weighs against suppression. Trooper Oxner stopped the defendants at 12:58 p.m. Agent Saroff arrived at the South Dakota Highway Patrol shop in Rapid City to interview defendants at approximately 17:30 p.m., which would be approximately four and one-half hours after the stop. This is not so long a period as to have presumptively purged the taint as a matter of law. However, it cannot be said that the interrogation with Agent Saroff followed directly on the heels of the illegal detention.

Third, there were intervening circumstances in this case between the constitutional violation and Mr. Verduzco's <u>Mirandized</u> statement. Agent Saroff is from a different law enforcement agency, the ICE agency, which is federal whereas Trooper Oxner is a member of a state agency. Neither Agent Saroff nor his agency participated in any way in the violation of Mr. Verduzco's Fourth Amendment rights. In addition, the interview with Agent Saroff took place in a different location than where the constitutional violation occurred.[5]

---

[5]Somewhat analogously, the Supreme Court held that a defendant's statement taken from him inside his home where police entered the home in violation of the Fourth Amendment should be suppressed, but later statements taken at the police station should not be suppressed. <u>New York v. Harris</u>, 495 U.S. 14, 19-20 (1990). As the Court explained, the Fourth Amendment seeks to protect the home (among other things), so the purposes of the Fourth Amendment are furthered by suppressing the statement taken in the defendant's home. <u>Id.</u> at 20. However, suppressing a statement taken at the

Finally, the court cannot conclude that Trooper Oxner's violation of the defendants' Fourth Amendment rights was purposeful and flagrant. As discussed above, the case law provides that a traffic stop is justified by any traffic violation, that an officer's subjective motive in effecting a traffic stop is irrelevant, and that an alert by a drug dog supplies probable cause for a search. Given this case law, the evidence shows that Trooper Oxner intended to exercise to the fullest extent possible the authority given him by this case law, but the court cannot conclude that he intended to exceed his authority, even though he did. Although mistaken, Trooper Oxner could have been making a good faith error in believing he had a reasonable basis for expanding the traffic stop. No evidence was introduced at the hearing that Trooper Oxner conceded the unconstitutionality of his conduct, as the officers in the <u>Brown</u> case did.

Furthermore, there is no evidence to suggest that Agent Saroff had any knowledge of facts that could have put him on notice that Mr. Verduzco had been illegally detained. From the evidence presented, Agent Saroff received a routine call to come to the Highway Patrol shop to interview the defendants, knowing nothing about what had transpired earlier. Agent Saroff, in taking

---

station house after <u>Miranda</u> warnings are given does nothing to deter future police misconduct aimed as violating the sanctity of the house. <u>Id.</u> Here, Agent Saroff did nothing wrong, either acting alone or in collusion with Trooper Oxner. Therefore, applying the exclusionary rule to the statement he took from Mr. Verduzco would not further the purposes of the Fourth Amendment's rule against unreasonable seizures.

Mr. Verduzco' s statement, acted with no improper intent whatsoever.  Based on the foregoing, the court concludes that Mr. Verduzco's statement to Agent Saroff should not be suppressed due to Trooper Oxner's violation of the defendants' Fourth Amendment rights.

Neither should Mr. Sandoval's pre-<u>Miranda</u> statements be suppressed as fruit of the poisonous tree for many of the same reasons.  The entirety of Mr. Sandoval's statements to Agent Saroff were pre-<u>Miranda</u> advisement.  However, as discussed above, the questions related to address, date of birth, and place of birth were routine booking questions exempt from <u>Miranda</u>'s requirement.  The sole question that is not exempt–the question about Sandoval's legal alien status–is being suppressed for reasons independent of the Fourth Amendment violation.  Accordingly, the court recommends that both defendants' "fruit of the poisonous tree" argument be rejected as grounds for suppression of their statements to Agent Saroff.

## CONCLUSION

This court respectfully recommends that Mr. Verduzco's motion to suppress [Docket No. 44] be denied in all respects.

The court recommends that Mr. Sandoval's motion to suppress [Docket No. 46] be granted in part and denied in part.  The motion to suppress physical evidence seized from the defendants' vehicle and to suppress Mr. Sandoval's statements at the scene of the traffic stop should be denied.  The motion to

suppress Mr. Sandoval's statement to Agent Saroff that he was in this country illegally should be granted.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained. See Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1)(B). Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Id. Objections must be timely and specific in order to require *de novo* review by the district court. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated June 24, 2010

BY THE COURT:

/s/ *Veronica L. Duffy*
VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE